IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | Criminal Case No.: 1:14-cr-206 |
| ITZHAK LOZ, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINON

This matter comes before the Court on Defendants Arkadiy Bangiyev and Eduard Bangiyev's Motions to Suppress Wiretap Evidence (Dkt. Nos. 333 & 340). The government has filed its consolidated response, to which Defendants have replied. The Court heard oral argument on the motions on December 5, 2014. For the reasons set forth below, the motions are hereby DENIED.

### I. Legal Standard

The federal wiretap statute, codified at 18 U.S.C. § 2510, *et seq.*, governs the issuance of wiretap orders to law enforcement. To authorize a wiretap, the issuing judge must find: (1) probable cause, and (2) that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995) (citing 18 U.S.C. § 2518(3)(c)).

### II. Analysis

The first issue before the Court is whether the wiretap affidavits articulated sufficient facts, amounting to probable cause, to justify the issuance of the October 3, 2013 wiretap order as to Eduard Bangiyev (hereinafter referred to as "Eduard") or the November 1, 2013 wiretap

1

order as to Arkadiy Bangiyev (hereinafter referred to as "Arkadiy"). The second issue is whether those affidavits demonstrated the government's necessity for the wiretap orders.

A. Probable Cause

The standard for review of wiretap orders is identical to the standard governing search warrants. *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983). That is, to find probable cause exists to justify issuing a wiretap order, the judge must find "a reasonable ground for belief of guilt" and "more than bare suspicion." *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012) (citing *Brinegar v. United States,* 338 U.S. 160, 175 (1949)). The wiretap statute specifically requires a judge to find probable cause to believe: (1) that an individual has committed, is committing, or is about to commit certain offenses, including counterfeiting; (2) that relevant communications will be intercepted by the wiretap; and (3) that the targeted persons will use the targeted facility. 18 U.S.C. § 2518(3).

*a. Probable Cause Existed as to Eduard Bangiyev*

There were sufficient facts in the wiretap affidavit for the Court to conclude there was probable cause to believe that Eduard was committing counterfeiting activities. The pen register data tracking Johnny Lee and Eduard's phones, undercover buys from Tarrell Johnson, physical surveillance of Lee and Johnson as well as the wiretap of Johnson's phone all support the agent's inference in the affidavit that Lee and Eduard were communicating about an upcoming meeting between Eduard, Lee and Johnson to exchange counterfeit currency. The wiretap affidavit outlined the following relevant facts.

On January 27, 2013, two cooperating sources, who are husband and wife, each passed two counterfeit $100 bills at a Walmart in Stafford County, Virginia. Oct. 3, 2013 Aff. Supp. Wiretap Appl. ("Oct. 3 Aff.") ¶ 18. In non-custodial interviews during the execution of a search

warrant on their residence, both implicated Tarrell Johnson as the source of the counterfeit currency. *Id.* at ¶¶ 18 & 22.

On May 17, 2013, Johnson contacted the male cooperating source to advise him that he had counterfeit currency available to sell. *Id.* at ¶ 32. A day earlier, Lee, whom agents determined was Johnson's supplier, and Eduard had exchanged multiple text messages and phone calls. *Id.* On May 20, 2013, Johnson sold the cooperating source, who was outfitted with audio and video recording devices, $10,000 in counterfeit currency while in Johnson's car. *Id.* at ¶ 35. One minute after this controlled purchase, Lee called Johnson. *Id.* at ¶ 36. Surveillance units then followed Johnson until he stopped in front of a residence the next town over, where they observed him meet Lee. *Id.* Lee and Johnson talked outside of their cars for about 50 minutes before engaging in a hand-to-hand transaction. *Id.* Because of the distance and the darkness, surveillance units were unable to see what exactly was exchanged. *Id.*

On September 2, 2013,[1] pen register data showed that five text messages were sent and received between Lee's and Eduard's phones from 9:03pm to 9:35pm. *Id.* at ¶ 57. At 9:18pm, Secret Service agents conducting surveillance of Lee and Johnson observed them each arrive at an intersection in Forest Hills, New York close to the Bangiyevs' residences. *Id.* Shortly thereafter, the agents engaged in a high speed chase of Johnson and Lee in Lee's car, lasting until about 9:50pm. *Id.* at ¶¶ 57 & 59. During an intercepted call to an unidentified female within 30 minutes of the chase, Johnson recounted the events stating, "we went to go bust a little crap

---

[1] Between May 20, 2013 and September 2, 2013, there was continued activity among the co-conspirators. Pursuant to a wiretap order dated June 25, 2013, agents began intercepting calls from Johnson's phone, including many communications with Lee. Dkt. No. 337, ex. 7; Oct. 3 Aff. ¶¶ 37–45. The Johnson wiretap order briefly expired on July 25, 2013 but was renewed on August 12, 2013. *Id.* at ¶ 46. Although not a cornerstone for probable cause in the government's briefing, it is worth noting that on August 2, 2013, pen register data showed that Lee contacted Eduard six times between 11:19am and 12:59pm. *Id.* at ¶ 47. The only other contact for Eduard's phone during that time period was to Arkadiy's land line. *Id.* GPS pings also showed that Lee's phone was in the vicinity of the Bangiyevs' residences at the time of Lee's last call to Eduard that day. *Id.* This location is the same location where Secret Service agents later observed Lee and Johnson on September 2, 2013. *Id.* There has been no attempt by Defendants to exclude the evidence from Johnson's wiretap.

move…when we finished when we were leaving…the feds were following us the whole time, we were on a high speed chase, had to really lose them." *Id.* at ¶ 59.

Pen register data also showed that Lee's phone contacted Eduard's phone fourteen times between 9:19pm and 11:02pm, during and after surveillance, via calls and text messages. *Id.* at ¶ 58. The only outgoing call during the high speed chase from Lee's phone was to Eduard, at 9:45pm. *Id.* at ¶¶ 58 & 60. During Johnson's intercepted call, he describes how Lee, who was in the car with him during the chase, said "he's like look in the rearview mirror son, he's like this car's following us, I'm like whatcha mean, I'm like na that's your man right, because he got his man got a black Range." *Id.* at ¶ 59. According to Johnson, Lee responded "that's a fucking Ford that's no fucking Range." *Id.* In addition, Johnson recalled how, during the chase, Lee told him "stuff the shit in your pants yo." *Id.*

A subsequent investigation revealed that a 2012 black Range Rover is registered to Eduard. *Id.* at ¶ 60 n. 11. A search of the National Vehicle Location Service's database also showed that this Range Rover had been spotted eight times near the closest intersection to Eduard's Forest Hills residence. *Id.* Based on the above facts, the agent stated in the affidavit that he believed Lee and Eduard had "exchanged text messages to advise one another when they had arrived at the meeting location to exchange counterfeit currency," that Johnson and Lee "suspected they were being followed by federal law enforcement and not local police and that they were carrying contraband, i.e. counterfeit currency," and that the black Range Johnson discussed in the intercepted call was the one registered to Eduard. *Id.* at ¶¶ 57, 59, 60 n. 11.

Defense counsel argues that the agent's use of the phrase "I believe" multiple times in the affidavit constituted "bare conclusions" that did not support a probable cause finding. Dkt. No. 341 at 5. But a court does not simply accept an agent's conclusions in a wiretap affidavit as

4

dispositive, the same way a court will not accept a lawyer's claim that a certain case is dispositive of a particular legal dispute. The Court finds no evidence that the affiant tried to deceive the Court or minimize evidence in either affidavit. A court reviewing a wiretap application and affidavit will and must always look to the underlying facts that form the basis for the agent's inferences and conclusions. Stripping the "I believe" statements and honing in on the information gained from the pen registers, undercover buys from as well as surveillance of co-conspirators Lee and Johnson, and the intercepted calls from Johnson, the facts outlined in the October 3, 2013 affidavit clearly support the agent's inferences regarding Eduard's involvement in the counterfeiting activities. There is also evidence of Eduard's prior involvement with his brother Arkadiy in the 2007 counterfeiting operation as detailed below. The Court thus agrees that there was probable cause to believe he had committed or was committing counterfeiting activities. The Court therefore finds, upon subsequent review, that there was probable cause for the issuance of the wiretap order as to Eduard Bangiyev.

   b. *Probable Cause Existed as to Arkadiy Bangiyev*

There were also sufficient facts in the November 1, 2013 wiretap affidavit for the court to conclude there was probable cause to believe that Arkadiy was committing counterfeiting activities. The pen register data, communications intercepted from Eduard's phone, statements of prior co-conspirators, a previous counterfeiting conviction, and the forensic link between counterfeit notes obtained from that case and the notes obtained during this investigation all support the agent's inferences regarding Arkadiy's involvement in the counterfeiting conspiracy. The affidavit outlined the following relevant facts.

In 2007, the Secret Service arrested Devon Bost, who admitted that he had been purchasing counterfeit currency "from 'the Jewelers,' two Russian brothers known to him as

5

'Alex' and 'Eddie' whose last name was unknown." Nov. 1, 2013 Aff. Supp. Wiretap Appl. ("Nov. 1 Aff.") ¶ 30. The purchases took place at a "jewelry shop located at Old Country Road, in Westbury, New York, as well as at other locations." *Id.* According to public records, the Bangiyev brothers indeed previously owned and operated a retail jewelry store called Elegant Jewelry on Old Country Road in Westbury. *Id.* at ¶ 32.

Under the supervision of the Secret Service, Bost purchased $100,000 in counterfeit $50 bills from Bost's supplier Alex. *Id.* at ¶ 30. These counterfeit bills were "forensically linked to the controlled purchase of counterfeit notes from Johnson (who obtained it from Lee) made during this investigation." *Id.* After the 2007 sale to Bost, the Secret Service arrested "Alex" who was later identified as Arkadiy. *Id.* In May 2008, Arkadiy was convicted by a jury in the United States District Court for the Eastern District of New York for dealing in counterfeit currency. *Id.* at ¶ 31.

Additionally, the only other person Eduard called on the night of the high speed chase on September 2, 2013 was Arkadiy at 10:45pm, approximately 55 minutes after the chase ended. *Id.* at ¶ 55. Based on the timing of this call, the surveillance of Lee and Johnson, and Johnson's intercepted call, the agent concluded in the affidavit that he believed Eduard contacted Arkadiy that evening to advise him that Lee claimed he was being followed by the "feds" after picking up counterfeit currency from him. *Id.* A month later, Eduard was heard asking an unidentified male in an intercepted call if he "ordered money...(inaudible)... for Arkadiy the 15[th]?" *Id.* at ¶ 65. The agent stated in the affidavit that he believed that Eduard was asking the male if he had "ordered counterfeit money for his brother, Arkadiy Bangiyev." *Id.*

On October 5, 2013, Eduard received a call from an unidentified male who stated, "remember that ummm charm bracelet that I was gonna get...call him and ask him if he's got it

cuz I'm ready to come get it...it was supposed to be like ummm 8 inches long." *Id.* at ¶ 64. Two minutes after receiving this call, Eduard called Arkadiy and asked, "how much of that uhh is left? Let me know he called... he is going to come by, pick it up . . . Find out exactly how much, call him, ok?" *Id.* In the affidavit, the agent concluded that the "8 inch bracelet" was code for counterfeit currency, and that Eduard had contacted Arkadiy to ask how much they had left. *Id.* Although defense counsel argues that this was not a coded conversation because the Bangiyevs in fact owned a retail jewelry store, at the time of the intercepted call the defendants owned AK 47th Street Buyers, which was not a retail jewelry store but rather a "'refinery' where gold and silver is bought, scrapped, and melted down." *Id.* at ¶ 16(g). Moreover, Eduard's question "how much of that uhh is left?" does not make any sense if it were indeed an inquiry about a specific charm bracelet requested by the unidentified male.

Ten days later on October 15, 2013, during another intercepted call, Arkadiy stated "he's here," to which Eduard responded "give him 100." *Id.* at ¶ 70. The agent stated that he believed Eduard had called Arkadiy "to coordinate the sale of counterfeit U.S. currency to an unknown individual." *Id.* The agent's conclusion is corroborated by the fact that surveillance units had observed an unknown individual with Colorado tags arriving at Arkadiy's house shortly before he received the call. *Id.* About an hour after the first call, Eduard called Arkadiy again and stated "I got a message all is normal." Based on the timing of the phone calls and the surveillance, the agent concluded that "the purpose of this call was to let Arkadiy know that the counterfeit currency exchange went according to plan." *Id.* at ¶ 72.

On October 20, 2013, Eduard stated during an intercepted call to Arkadiy, "you promised to give me that shit, 220 in 10s... that's what I need. Do you have it?" *Id.* at ¶ 81. During another intercepted call from Eduard to an unknown female that same day, the female states, "I

7

counted 2,000 to dad...there is 3,400 in there...from here, I will also take the money to give to that one guy..." *Id.* at ¶ 82. The agent concluded that the female was counting out currency at Eduard's direction, who had recently asked Arkadiy for "220 in 10s." *Id.*

Defense counsel for Arkadiy also attacks the agent's use in the affidavit of the phrase "I believe" as proof that the agent "rested on bare bones conclusions, rather than facts" to support a probable cause finding. Dkt. No. 337 at 19. As stated above, a court reviewing a wiretap application and affidavit must always look to the underlying facts that form the basis for the agent's inferences and conclusions. Stripping the "I believe" statements from the affidavit and honing in on statements of prior co-conspirators, a previous counterfeiting conviction, and the information gained from pen registers, surveillance, and communications intercepted from Eduard's phone, the facts outlined in the November 1, 2013 affidavit clearly support the agent's focused inferences regarding Arkadiy's involvement in the counterfeiting activities. The Court thus agrees that there was probable cause to believe Arkadiy had committed or was committing counterfeiting activities, and will therefore uphold the court's issuance of the wiretap order as to Arkadiy Bangiyev.

B. Necessity

Due to wiretaps' intrusive nature, the federal wiretap statute ensures that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974). The Fourth Circuit has held that the burden of establishing necessity "is not great." *Oriakhi*, 57 F.3d at 1298. As conceded by the defendants during oral argument, the statute does not require wiretapping to be *the* last resort. *See United States v. Martinez*, 493 F. App'x 467, 470–71 (4th Cir. 2012) (upholding wiretap order, stating that "although [traditional] methods yielded significant evidence, they

were not sufficient to achieve their goals, such as successfully apprehending and prosecuting local co-conspirators and then-as-yet unidentified individuals higher up in the distribution scheme, identifying the location of stash houses and obtaining the evidence necessary to seize drug proceeds"). Instead, law enforcement must demonstrate, through affidavits in the wiretap application, that "it has encountered difficulties in penetrating [the] criminal enterprise or in gathering evidence with normal techniques to the point ... where wiretapping becomes reasonable." *Oriakhi*, 57 F.3d at 1298 (quoting *United States v. Smith*, 31 F.3d 1294, 1298 (4th Cir. 1994)) (internal quotation marks omitted). A judge reviewing the adequacy of this showing must test the underlying affidavits "in a practical and commonsense fashion ... that does not hamper unduly the investigative powers of law enforcement agents." *Id.* (quoting *Smith*, 31 F.3d at 1297) (internal quotation marks omitted).

In this case, traditional investigative methods, such as pen registers, controlled purchases of counterfeit currency from Johnson by a cooperating source, and physical surveillance of Lee, Johnson, and the Bangiyev residences, were indeed employed and yielded significant evidence. Oct. 3 Aff. ¶¶ 35, 57–59; Nov. 1 Aff. ¶ 70. The difficulties of gathering evidence with these traditional methods, as stated by the agent in the affidavits, however, were plentiful and ultimately justified the issuance of the wiretap orders in this case.

Surveillance clearly had its limits in this investigation. On one occasion, surveillance units were unable to see what Johnson and Lee exchanged by hand on May 20, 2013 due to the "darkness and distance of the surveillance units." Oct. 3 Aff. ¶ 36. On another occasion, surveillance units observed Lee and Johnson arrive at an intersection near the Bangiyevs' residences but were unable to see what transpired. *Id.* at ¶ 57. In fact, Lee and Johnson detected the surveillance units as "the feds," and proceeded to lead the agents in a high speed chase. *Id.* at

¶¶ 57, 59. Agents also surveilled Arkadiy's house, but were unable to identify the four visitors seen at the residence. Nov. 1 Aff. ¶¶ 97–104. The benefits to be gained from surveillance are by nature, and as evidenced in this case, limited. More importantly, however, the high speed chase of Lee and Johnson demonstrated that surveillance posed not only the threat of being detected, but also risked becoming "too dangerous." 18 U.S.C. § 2518(3)(c).

The affidavit also outlined the government's use of a cooperating source to make controlled purchases of counterfeit currency from Johnson. Oct. 3 Aff. ¶ 35. Because the cooperating source told investigators that Johnson will only sell counterfeit currency to people he knows personally, the agent stated in both affidavits that he did not believe an attempt to use an undercover agent would be successful in uncovering additional information. *Id.* at ¶¶ 82–83; Nov. 1 Aff. ¶ 105–06.

The affidavits also discussed the consideration and rejection of the use of search warrants or trash searches. The agent described how a search warrant executed at the home of the cooperating source yielded no counterfeit currency, and would likely be of similarly limited value as to the other target subjects. Oct. 3 Aff. ¶¶ 84–87; Nov. 1 Aff. ¶ 109. Trash searches were rejected due to the target subjects' living in densely populated areas, thereby risking detection. Moreover, trash searches were not deemed likely to produce significant evidence because counterfeiting "is not a document intensive crime." Oct. 3 Aff. ¶¶ 90–91; Nov. 1 Aff. ¶ 113. Defendants' argument that the seizure of the documents from the warehouse belies this statement is unpersuasive, as the warehouse functioned as the counterfeit currency manufacturing site with significant supplies and manufacturing paraphernalia and was not the defendants' home.

The affidavits also discussed how the traditional investigative methods of grand jury subpoenas, grants of immunity, and financial investigations were unlikely to produce the evidence the government was seeking. Oct. 3 Aff. ¶ 88; Nov. 1 Aff. ¶¶ 111–12, 124–25. These methods were also rejected because they would or might disclose and compromise the still covert investigation. The government sought to achieve the following goals with the requested wiretap orders, as listed in the affidavits: (1) discovering the full scope of those involved in the criminal organization; (2) discovering the true identities, roles, and locations of those involved; (3) discovering the leadership, structure, location, and methods of operation of the criminal enterprise; (4) discovering the location, administration, control management, and disposition of the proceeds generated by the criminal enterprise; and (5) obtaining admissible evidence that demonstrates beyond a reasonable doubt that the target subjects committed the target offenses. Oct. 3 Aff. ¶ 73; Nov. 1 Aff. ¶ 94. All of the above were rational law enforcement goals. The Court thus agrees with the government that normal investigative techniques were inadequate to achieve the government's goals of understanding the structure and scope of the conspiracy, as well as gathering admissible evidence.

As the Fourth Circuit has clearly stated, the burden of showing necessity in a wiretap application "is not great." *Oriakhi*, 57 F.3d at 1298. The government clearly met its burden in the wiretap applications to demonstrate its difficulties in penetrating this widespread criminal enterprise spanning from Georgia to New York. The affidavits meticulously outlined the traditional investigative methods already employed, their limitations, and the still outstanding goals of the investigation. Accordingly, the wiretap orders issued by the district judges in this case will be upheld as the government has more than demonstrated their necessity.

## III. Conclusion

For the foregoing reasons, the Court finds that there was probable cause as to both Eduard Bangiyev and Arkadiy Bangiyev to justify the issuance of the wiretap orders targeting their phones. The Court also finds that the government demonstrated its necessity for those orders in the affidavits accompanying the wiretap applications. Accordingly, it is hereby

ORDERED that Defendants Arkadiy Bangiyev and Eduard Bangiyev's Motions to Suppress Wiretap Evidence (Dkt. Nos. 333 & 340) are DENIED. It is also

ORDERED that the evidence may be used against each of the defendants, and that the objections raised by each defendant, having adopted and conformed their arguments to those of Defendants Arkadiy Bangiyev and Eduard Bangiyev, are denied.

December 17, 2014

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge